<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 98-1331

           PUERTO RICO AQUEDUCT AND SEWER AUTHORITY,
                     Plaintiff, Appellant,

                               v.

           CONSTRUCTORA LLUCH, INC., AND CNA CASUALTY
                     OF PUERTO RICO, INC.,
                     Defendants, Appellees.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

                FOR THE DISTRICT OF PUERTO RICO

         [Hon. Hctor M. Laffitte, U.S. District Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

Hall, Senior Circuit Judge,

                   and Lipez, Circuit Judge.

                     _____________________

    Carlos A. Rodrguez-Vidal, with whom Goldman Antonetti &
Crdova was on brief, for appellant.
    Jos M. Biaggi-Junquera, with whom Jos Enrique Otero was on
joint brief, for appellees.

                      ____________________

                      February 18, 1999
                      ____________________

         TORRUELLA, Chief Judge.  Before the Court is plaintiff-
appellant Puerto Rico Aqueduct and Sewer Authority's ("PRASA")
appeal from the district court's denial of PRASA's motion for a
second partial new trial on damages.  At the first partial new
trial, the jury awarded PRASA no damages despite an earlier verdict
finding defendant-appellee Constructora Lluch, Inc. ("Lluch") to be
negligent and in breach of the construction contract between the
two.  PRASA also appeals from a jury award on Lluch's counterclaims
against PRASA for breach of contract and for amounts owed on the
contract.  For the reasons stated in this opinion, we affirm the
judgment awarding Lluch $756,471.59 on its counterclaims, but
vacate the judgment awarding PRASA no damages on its claims and
remand for a second partial new trial on the issue of damages.   
                           BACKGROUND
         This case arises out of the collapse, during
construction, of the steel roof structure of the Mayaguez
Composting Facility in October of 1989.  PRASA entertained bids for
the project and eventually awarded the project's design to Lebrn
Associates, an engineering and architecture firm.  In May of 1988,
PRASA entered into a construction contract with Lluch to build the
facility.  Several months later, Lluch subcontracted with Richmond
Steel, Inc. ("RSI") to manufacture and install the facility's steel
components, including the roof.
         The Mayaguez facility was to be a compost treatment plant
comprised of a main building to deposit and treat compost and a
separate administrative building.  The main building was designed  
as two adjacent bays with three lines of columns to support two
separate steel frame roofs.   Among the plans and specifications
developed by Lebrn was a procedure to be followed for the
preparation and consolidation of the soil.  Under the procedure,
Lluch was required: (1) to place a permanent landfill on the site;
(2) to install wicks and pertinent instrumentation; (3) to place a
surcharge on the site; and (4) to leave the surcharge undisturbed
for a period of seven and a half months.  However, before the
consolidation of the soil was completed, Lluch removed the
surcharge from the soil in order to begin the concrete construction
and in order to allow RSI to begin the steel erection.
    On October 22, 1989, after RSI had erected a substantial
part of the east portion of the steel roof structure, the
uncompleted west portion of the steel roof structure collapsed.
After the collapse, Lluch removed the collapsed steel frames and
debris, began to repair the damaged columns, and continued with
construction of the remaining phases of the project, all with
PRASA's authorization and under PRASA's supervision.  After Lluch
had substantially completed the construction of the project -- with
the exception of the steel roof structure -- PRASA demolished the
entire project, over Lluch's objection.   
    On October 10, 1990, this action was filed in United
States District Court for the District of Puerto Rico by RSI,
seeking monetary and declaratory relief against PRASA, Lluch,
Lebrn, and their bonding and surety companies.  Several
counterclaims, cross-claims, and third-party claims followed, most
of which were dismissed before trial.  Included in those rulings,
the district court dismissed PRASA's cross-claim under Article 1483
of the Puerto Rico Civil Code against Lluch and RSI.  See Richmond
Steel, Inc. v. Legal and Gen. Assurance Soc'y, Ltd., 825 F. Supp.
443, 445 (D.P.R. 1993).
    At the first trial in 1993, some of the parties entered
into various stipulations, including the dismissal of original
plaintiff RSI.  The district court then realigned the parties to
continue the trial.  As a result, PRASA became the plaintiff, and
Lluch, Lebrn, and CNA Casualty of Puerto Rico, Inc. ("CNA")
remained as defendants.  On August 9, 1993, after a twenty-four day
trial, the jury, in a special verdict form, found: (1) that Lluch
improperly removed the surcharge from the construction site or in
some other way breached its contract with PRASA by negligent
construction work; (2) that this breach caused the collapse of the
roof structure; (3) that this breach caused damages to PRASA; (4)
that PRASA's demolition of the remains of the structure was
unjustified; and (5) that PRASA suffered $4,587,202.77 in damages
as a result of Lluch's breach.  With regard to the counterclaims
against PRASA, the jury found: (1) that PRASA breached its contract
with Lluch; (2) that this breach caused damages to Lluch in the
amount of $138,758; (3) that PRASA owed Lluch $617,713.59 for work
performed on the contract; and (4) that PRASA owed Lebrn
$40,148.28 on the contract.  As a result of these findings, the
jury awarded: (1) $4,587,202.77 to PRASA for Lluch's negligence and
breach of contract; (2) $756,471.59 to Lluch on its counterclaims
against PRASA for breach of contract and money owed on the
contract; and (3) $40,148.28 to Lebrn on its counterclaim against
PRASA for money owed on the contract.
    On October 15, 1993, the district court issued a judgment
consistent with the damages awarded by the jury.  In an order
issued the same day, the district court advised counsel that all
post-trial motions were required to be filed or renewed within 10
days of the date of the judgment.  On October 21, 1993, CNA and
Lluch filed a timely motion for a new trial on PRASA's claims.  On
November 4, 1993 -- twenty days after the entry of judgment --
PRASA filed a motion for judgment as a matter of law with regard to
Lluch's counterclaims.
    On July 27, 1994, the court granted CNA and Lluch's
motion for a new trial, subject to PRASA's acceptance of a
remittitur.  The court concluded that the jury award was excessive
in light of the evidence presented.  The court then gave PRASA the
option of accepting a remitted award of $1,224,000 or a partial new
trial on damages.  PRASA opted for a new trial.  
    On March 24, 1995, the court denied PRASA's motion for
judgment as a matter of law on Lluch's counterclaims.  The court
found that the evidence was sufficient to allow a reasonable jury
to reach a verdict in favor of Lluch on those claims.
    On February 7, 1996, the court set the scope of the
partial new trial on damages for PRASA's claims.  The court held
that the new trial would be limited only to the extent of PRASA's  
damages at the time of the collapse.  The court concluded that,
because the jury in the first trial found that PRASA was
unjustified in demolishing the structure, damages would be limited
to the cost to repair the collapse as of October 22, 1989, the date
of the collapse.
    At the partial new trial, PRASA presented evidence that
the soil conditions at the site were unstable and were experiencing
settlement beyond what was expected.  PRASA's experts testified
that the soil had to be improved in order to repair the collapse,
either through placing a new surcharge on the site or by installing
piles to support the structure.  PRASA's experts testified that
only the option of installing piles was feasible, but that it would
cost in excess of $6 million to do.  Lluch and CNA presented
testimony that the soil did not have to be improved to repair the
collapse and that it would have cost approximately $500,000 to
repair the damage.  Lluch and CNA also presented testimony that
Lluch intended to absorb the costs of repair and that PRASA was
never going to be charged for those costs.
    The court instructed the jury: (1) that PRASA was
entitled to claim the extent of any damages it suffered at the time
of the collapse on October 22, 1989; and (2) that those damages
were limited to the cost to repair the collapse.  The court also
instructed the jury to accept as established facts: (1) that Lluch
improperly removed the surcharge or breached its contract in some
other way by negligent construction; (2) that this breach or
negligence caused the collapse; and (3) that PRASA's subsequent
demolition of the structure was unjustified.  The court informed
the jury that if PRASA failed to establish the amount of damages
caused by Lluch, then PRASA was not entitled to collect any
damages.  The court then submitted a verdict form to the jury that
asked whether PRASA suffered any damages, and if so, the amount of
those damages.
    On July 15, 1997, the jury returned the verdict form
indicating that it found that PRASA suffered no damages.  Judgment
was entered the next day, ordering that PRASA take nothing from
Lluch and CNA.
    On August 1, 1997, PRASA filed a motion for a second
partial new trial on the issue of damages or for reinstatement of
the 1993 verdict.  On December 11, 1997, the court entered an
Opinion and Order denying PRASA's motion.  On December 22, 1997,
PRASA filed a motion to alter or amend the December 11, 1997
Opinion and Order.  On January 22, 1998, the court denied PRASA's
motion to alter or amend by Endorsed Order.  The Court photocopied
the motion, wrote "Denied" in the margin of the photocopy, and
referred the parties to the December 11, 1997 Opinion and Order.  
On January 27, 1998, PRASA filed a notice of appeal from the
July 16, 1997 judgment, the December 11, 1997 Opinion and Order,
and the January 22, 1998 Endorsed Order.
                           DISCUSSION
I.  Jurisdiction
    Before we reach the merits, we must first address
appellees' contention that we lack jurisdiction over PRASA's
appeal.  The docket reflects the following chain of relevant
events:
         July 16, 1997 - The district court entered judgment
         awarding no damages to PRASA;
         August 1, 1997 - PRASA filed a Rule 59(b) motion for a
         second partial new trial on damages or for
         reinstatement of the prior verdict;
         December 11, 1997 - The district court entered an
         Opinion and Order denying PRASA's motion for a second
         partial new trial on damages;
         December 22, 1997 - PRASA filed a motion to alter or
         amend the December 11, 1997 Opinion and Order;
         January 22, 1998 - The district court denied PRASA's
         motion to alter or amend by entering an Endorsed Order.  
         The Endorsed Order consisted of a photocopy of PRASA's
         motion to alter or amend, with a notation in the margin
         signed by the district judge.  The notation stated:
         "Denied.  See docket no. 624  ."  Docket No. 624 is the
         court's December 11, 1997 Opinion and Order;
         January 27, 1998 - PRASA filed its notice of appeal
         from the July 16, 1997 judgment, the December 11, 1997
         Opinion and Order, and the January 22, 1998 Endorsed
         Order.
    Appellees argue that appellate jurisdiction is lacking
because PRASA's December 22, 1997 motion to alter or amend the
December 11, 1997 Opinion and Order did not toll the time to appeal
the judgment or the Opinion and Order.  Federal Rule of Appellate
Procedure 4(a)(4)(C) provides that the filing of a motion to alter
or amend the judgment under Federal Rule of Civil Procedure 59(e)
tolls the time for appeal until the district court issues an order
disposing of the motion.  Appellees claim that PRASA's motion is
not really a motion to alter or amend the December 11, 1997 Opinion
and Order because it requested the same relief sought by the motion
for a second partial new trial, and did so on the same grounds.  
Appellees argue that PRASA's motion to alter or amend is really a
motion to reconsider the July 16, 1997 judgment.  Appellees point
out that the motion to alter or amend is, in some places, an exact
verbatim copy of the motion for a new trial.  Appellees further
claim that even the non-verbatim portions merely recast the
arguments of the motion for a new trial with the addition of
quotations from the trial transcript.
    Appellees correctly note that the filing of a motion to
reconsider will only toll the time for appeal if the motion is
filed no later than ten days after the entry of the judgment from
which reconsideration is sought.  See Fed. R. App. P. 4(a)(4)(F).  
Appellees claim that since PRASA's December 22, 1997 motion is
really a motion to reconsider the July 16, 1997 judgment, it needed
to be filed within ten days of July 16, 1997 to have any effect on
the time to appeal.  In support of this position, appellees cite
Acevedo-Villalobos v. Hernndez, 22 F.3d 384 (1st Cir.), cert.
denied, 513 U.S. 1015 (1994).  In Acevedo-Villalobos, the Court was
faced with a situation in which the district court entered a
judgment of dismissal and the plaintiffs filed one post-judgment
motion within 10 days of the judgment and another post-judgment
motion more than 10 days from the entry of judgment.  See id. at
389-90.  Even though the second motion purported to request
reconsideration of the denial of the first motion, the Court found
that the second motion was "an obvious attempt to have the district
court revisit the legal basis for" the original judgment of
dismissal.  Id. at 390.  The Court noted that the second motion
requested the same relief that the first motion requested, and did
so on the same grounds.  See id.  Therefore, the Court treated the
second motion as a motion to reconsider the original judgment of
dismissal.  See id.  Because the second motion was untimely as such
a motion to reconsider, the Court found: (1) that it did not extend
the tolling of the time to appeal the original judgment of
dismissal; and (2) that it did not toll the time to appeal the
denial of the first post-judgment motion.  See id.  
    Appellees argue that the same result should follow in the
present case because the December 22, 1997 motion is really a
motion to reconsider the July 16, 1997 judgment and because the
motion was filed over five months after the July 16, 1997 judgment.  
From this, appellees argue: (1) that the time to appeal the
July 16, 1997 judgment was tolled only by the filing of the Rule
59(b) motion for a second partial new trial and therefore expired
on January 11, 1998; (2) that the time to appeal the December 11,
1997 Opinion and Order was never tolled and also expired on
January 11, 1998; and (3) that there was no time to appeal the
January 22, 1998 Order, because the untimeliness of the motion to
reconsider deprived the district court of jurisdiction to decide
it.
    We cannot accept appellees' contentions.  We are faced
with a different situation than that presented in Acevedo-
Villalobos.  In that case, the Court found that the tolling
terminated with the denial of the first post-judgment motion.  SeeAcevedo-Villalobos, 22 F.3d at 390.  In the present case, however,  
the December 11, 1997 Opinion and Order -- the order denying
PRASA's first post-judgment motion -- did not stop the tolling of
the time to appeal the July 16, 1997 judgment because, as discussed
below, it was not a "final judgment" in compliance with the
"separate document" rule of Federal Rule of Civil Procedure 58.   
    Federal Rule of Appellate Procedure 4(a)(4) provides that
the tolling commenced by the filing of a proper post-judgment
motion continues until "the entry of the order disposing of the
last such motion outstanding."  Fed. R. App. P. 4(a)(4).  
Subsection (a)(7) states that "a judgment or order is entered
within the meaning of this Rule 4(a) when it is entered in
compliance with Rules 58 and 79(a) of the Federal Rules of Civil
Procedure."  Fed. R. App. P. 4(a)(7).  Therefore, in order to halt
the tolling of the time to appeal, an order denying a tolling post-
judgment motion must comply with Rule 58.  See also Kersey v.
Dennison Mfg. Co., 3 F.3d 482, 484-85 (1st Cir. 1993) (finding that
the tolling of the time to appeal from a certified judgment never
stopped because, even though the district court "announced" its
denial of a tolling post-judgment Rule 59(e) motion in an order, it
never issued a separate document); Fiore v. Washington Cty. Com.
Mental Health Ctr., 960 F.2d 229, 233 (1st Cir. 1992)(en
banc)(noting Rules 4(a)(4) and 4(a)(7) and stating that those
subsections expressly impose Rule 58's separate document
requirement on denials of post-judgment motions that toll the time
for appeal).  Because we find below that the December 11, 1997
Opinion and Order did not comply with Rule 58, we find that it did
not stop the tolling of the time to appeal the July 16, 1997
judgment.
    Rule 58 states that "[e]very judgment shall be set forth
on a separate document" and that "[a] judgment is only effective
when so set forth."  Fed. R. Civ. P. 58.  In Fiore v. Washington
Cty. Com. Mental Health Ctr., this Court held that Rule 58 shall be
applied to all final orders denying and granting post-judgment
motions under Rules 50(b), 59(b), 59(e), and 60(b).  See Fiore, 960
F.2d at 232-33; see also Credit Francais Int'l, S.A. v. Bio-Vita,
Ltd., 78 F.3d 698, 704 n.12 (1st Cir. 1996) ("[T]he 'separate
document' rule does apply to orders denying Rule 59(e) motions.").  
In doing so, the Fiore Court concluded that "technical compliance
with the [separate document requirement] is as necessary in the
post-judgment context as it is in disposing of the merits."  Fiore,
960 F.2d at 235.  Because PRASA's motion for a second partial new
trial was a Rule 59(b) motion, it fits within Fiore's "uniform
approach for all orders denying post-judgment motions under Rules
50(b), 52(b) and 59(b) and (e), as well as under Rule 60(b)."  Id.at 232.  Thus, the Opinion and Order denying PRASA's motion for a
second partial new trial must comply with Rule 58.
    The December 11, 1997 Opinion and Order was a five-page
opinion which considered PRASA's motion for a second partial new
trial.  In the Opinion and Order, the district court addressed and
rejected each of PRASA's arguments in turn, using explanatory
language to give its reason for each rejection.  The Opinion and
Order concluded with the following statements: "Accordingly, the
Court hereby denies the motion for a new trial.  IT IS SO ORDERED."  
    Appellees argue that the Opinion and Order, by itself,
was a separate document, as contemplated by Rule 58.  Appellees
claim that the Opinion and Order was originated by the district
court as a separate piece of paper and that the Opinion and Order
discussed the merits of PRASA's motion for a new trial.  Appellees
further claim that there was no margin for confusion or uncertainty
as to the finality of the order.  Appellees cite Hollywood v. City
of Santa Mara, 886 F.2d 1228, 1231 (9th Cir. 1989), for its
holding that a separate document was not required to accompany a
nine-page order denying a Rule 59 motion for a new trial.  In that
case, the Ninth Circuit noted that it had previously held that
compliance with Rule 58 "requires entry of a document distinct from
any opinion or memorandum."  Id. at 1231 (citing Allah v. Superior
Court, 871 F.2d 887, 890 (9th Cir. 1989); Vernon v. Heckler, 811
F.2d 1274, 1276 (9th Cir. 1987)).  The Hollywood court then refused
to extend this rule to the context of orders denying Rule 59
motions.  See id.  The court found that the risk of confusion
regarding finality does not exist in the context of denials of Rule
59 motions for a new trial.  See id. at 1232.  The court held that
the order denying the Rule 59 motion "definitively signaled the end
of the litigation."  Id.     
    In relying on Hollywood, appellees make an argument
directly at odds with this Court's holding in Fiore.  In Fiore, the
Court held that "technical compliance with the [separate document
requirement] is as necessary in the post-judgment context as it is
in disposing of the merits."  Fiore, 960 F.2d at 235.  The Court
recognized that the uncertainty that prompted the separate document
rule would be less likely to occur with respect to post-judgment
orders than for initial judgments.  See id. at 234.  Nonetheless,
the Court stated that, because some uncertainty will always exist,
consistency and clarity would be better achieved by following the
rules as written than by trying to distinguish one type of judgment
or order from another.  See id.  In footnote 9, the Court stated
that Hollywood was "at odds with our conclusion that post-judgment
motions should be treated identically with judgments on the
merits."  Id. at 235 n.9.  Therefore, appellees' reliance on
Hollywood is misplaced; we are bound by Fiore's holding that orders
denying Rule 59(b) motions are subject to the separate document
requirement of Rule 58.
    Appellees cannot escape the fact that the December 11,
1997 Opinion and Order was a five-page explanatory opinion denying
PRASA's motion that was not accompanied by a separate one-line
judgment.  This does not comply with the separate document
requirement of Rule 58.  Several courts have found that detailed
opinions similar to the December 11, 1997 Opinion and Order violate
the separate document requirement because they were not accompanied
by a short separate judgment.  See, e.g., Baker v. Mercedes Benz of
North America, 114 F.3d 57, 60 (5th Cir. 1997) (holding that Rule
58 was not satisfied by an extensive written opinion concluding
with the sentence: "This is a final judgment", because there was no
separate document judgment); Barber v. Whirlpool Corp., 34 F.3d
1268, 1275 (4th Cir. 1994)(holding that an eleven-page order
setting forth findings of fact and conclusions of law and
dismissing defendant's post-trial motions did not satisfy the
separate document rule); Clough v. Rush, 959 F.2d 182, 184-85 (10th
Cir. 1992) (holding that the absence of a separate document
rendered an order nonfinal, even though the order granting summary
judgment was fifteen pages long and contained detailed legal
reasoning).  We recognize the irony in finding that an Opinion and
Order is not an effectively final judgment because it contains
pages of explanatory language and reasoning.  However, this Court's
concerns for certainty and predictability in Fiore gave rise to a
uniform rule of technical compliance.  Consequently, we find that
the December 11, 1997 Opinion and Order did not comply with the
separate document requirement of Rule 58.  Therefore, the
December 11, 1997 Opinion and Order did not stop the tolling of the
time to appeal the July 16, 1997 judgment.
    Even though the December 11, 1997 Opinion and Order was
not a final judgment in compliance with the separate document
requirement of Rule 58, we nevertheless have jurisdiction over the
appeal if the parties are found to have waived the separate
document requirement.  In Bankers Trust v. Mallis, 435 U.S. 381,
386 (1978), the Supreme Court stated that judicial efficiency
requires that the parties be able to waive the separate document
requirement in order to avoid the pointless exercise of dismissing
the appeal only to have it refiled when the district court enters
the required separate document.  The Court then went on to find
waiver in that case because the petitioner (who was the appellee at
the circuit level) did not object to the taking of the appeal in
the absence of a separate judgment.  See id. at 387-88.  We have
previously applied this waiver principle "where both parties waive
the requirement and neither party would be prejudiced or misled by
the lack of a separate document."  Wang Laboratories, Inc. v.
Applied Computer Sciences, Inc., 926 F.2d 92, 96 (1st Cir. 1991);  
see also Smith v. Massachusetts Dep't of Correction, 936 F.2d 1390,
1394 (1st Cir. 1991).  We have also stated that "the separate
document requirement should always be interpreted to prevent the
loss of the right to appeal, not to facilitate loss."  Fiore, 960
F.2d at 236-37 (internal quotation marks omitted).
    In the present case, both PRASA and appellees have waived
the separate document requirement.  PRASA clearly waived the
requirement when it filed its notice of appeal in the absence of a
true final judgment.  See id. at 236 n.10.  Appellees waived the
requirement by failing to object at any point to the taking of an
appeal in the absence of a separate document.  To date, appellees
have never claimed that no separate document has issued or that
this appeal may not proceed because no separate document has
issued.  Appellees moved to dismiss the appeal for lack of
jurisdiction, but this motion claimed that the January 27, 1998
notice of appeal was untimely, an argument which is predicated on
the validity and finality of the December 11, 1997 Opinion and
Order.  Appellees did not raise the separate document issue in any
form until the Court denied the motion to dismiss the appeal and
specifically inquired about compliance with the separate document
rule.  Appellees' current position is that the Opinion and Order is
a separate document and therefore the notice of appeal was
untimely, so appellees do not, even today, object to the taking of
an appeal in the absence of a separate document.    
    Nor does it appear that either PRASA or appellees have
been prejudiced or misled by the lack of a separate document.  
Appellees apparently did not even suspect that the December 11,
1997 Opinion and Order was insufficient until the Court's request
for briefing on the issue.  PRASA was not prejudiced or misled by
the lack of a separate document because it took steps -- in the
form of the December 22, 1997 motion to alter or amend and the
January 27, 1998 notice of appeal -- to ensure that it was not
sleeping on its appellate rights.  Therefore, under Bankers Trust,
Smith, and Wang, we find that the parties have waived the separate
document requirement of Rule 58.  Consequently, we have
jurisdiction over the present appeal even though the December 11,
1997 Opinion and Order was not a valid final judgment in compliance
with Rule 58.   
II. The District Court's Denial of PRASA's Motion For a Second    
   Partial New Trial on the Issue of Damages

        PRASA argues that the district court abused its
discretion in denying PRASA's motion for a second partial new trial
on the issue of damages.  PRASA argues that a second partial new
trial should have been granted because: (1) the jury verdict
awarding no damages was against the demonstrable weight of the
evidence; (2) the district court erred in allowing the jury to
redetermine issues already determined by the first jury; and (3)
appellees' counsel made improper and prejudicial remarks to the
jury during opening and closing statements.  
        The denial of a new trial is reviewed for abuse of
discretion.  Bogosian v. Mercedes-Benz of North America, Inc., 104
F.3d 472, 482 (1st Cir. 1997).
        A.       Jury Verdict Against the Weight of the Evidence
        PRASA first argues that the 1997 jury verdict was against
the weight of the evidence because it was inadequate to compensate
PRASA for its damages.  A verdict may be set aside and a new trial
ordered "when the verdict is against the clear weight of the
evidence, or is based upon evidence which is false, or will result
in a clear miscarriage of justice."  Phav v. Trueblood, Inc., 915
F.2d 764, 766 (1st Cir. 1990)(citing Torres-Troche v. Municipality
of Yauco, 873 F.2d 499 (1st Cir. 1989)).
        PRASA argues that the clear weight of the evidence at the
partial new trial established that PRASA suffered significant
damages.  The jury in the first trial found that Lluch had been
negligent in breaching its contract with PRASA, that Lluch's breach
caused the collapse of the structure, and that this breach caused
damages to PRASA.  While the district court set aside the amount of
damages awarded as excessive, it did not set aside the jury's
finding of negligence or the jury's finding that this negligence
caused PRASA damages.  Rather, the district court specifically
instructed the second jury to accept those two determinations.  
Then, the district court set the parameters for the amount PRASA
could recover by instructing the second jury that:
        PRASA is entitled to recover an amount which
        will reasonably compensate it for any damages
        it had suffered as a result of Lluch's breach
        of contract or negligence as of the date of
        the collapse on October 22, 1989.  
        Specifically, PRASA is entitled to recover the
        cost to repair the collapse.  

        PRASA argues that the clear weight of the evidence
presented at the partial trial showed that it suffered significant
damages as of the date of the collapse.  PRASA breaks down the cost
of repair into two components: (1) the cost of preparing the soil
to support the repaired roof structure; and (2) the cost of
repairing the roof structure itself.  The first component was
sought by PRASA as the cost of the stabilization of the soil or the
installation of piling support at the construction site.  PRASA
notes that the first jury determined: (1) that Lluch improperly
removed the surcharge from the soil at the construction site or in
other ways acted negligently in breaching its contract with PRASA;
and (2) that Lluch's improper removal caused the collapse of the
roof structure.  PRASA argues that the cost of repair must include
the cost of stabilization or piling support because it would be
futile to attempt to install the roof structure again without first
improving or supporting the soil.  
        In an attempt to prove that the soil at the site must be
improved or supported before repair of the structure could begin,
PRASA offered the testimony of Engineers Carlos Ortiz, Angel
Herrera, and Alan Crumley.  Ortiz testified that he conducted soil
exploration at the site after the collapse and that he determined
that the soil had settled nearly 70 cm, almost twice the settlement
expected when the site was originally analyzed in 1986.  Ortiz also
detected settlement of the concrete columns on which the new roof
structure would be installed.  Ortiz concluded that because the
consolidation and settlement of the soil was ongoing at the time of
the collapse, the soil needed to be treated in order to build on
it.  Herrera, an expert in design, construction and estimates of
costs of repairs of failures or collapses of structures, testified
that, at the time of the collapse, the soil at the site was notcompetent to support the building as designed. Crumley testified
that he analyzed the soil in 1995 and found that primary
settlements were still occurring and were therefore occurring at
the time of the collapse at a rapid rate.  Crumley opined that
repairing the collapse in 1989 would have required either improving
the soil or installing piles.  
        The district court apparently agreed with PRASA's
assertion that the soil had to be improved before the structure
could be repaired.  Appellees objected to testimony regarding soil
improvement measures as beyond the scope of the cost of repairing
the collapse, but the court overruled those objections and stated
that "to repair he's got to do that."  
        PRASA attempted to quantify how much it would cost to
improve the soil or install piles through Herrera's testimony.  
Herrera first considered the option of surcharging the soil, but
rejected that alternative because of the uncertainty of the
settlement.  Therefore, Herrera recommended the second alternative:
installing piles for support.  Herrera testified that properly
installing piles for support would require the following steps (and
costs): (1) removing portions of the floor slab ($82,500); (2)
installing piles ($3,201,000); (3) raising the existing footings
($440,000); (4) installing new footings to connect the piles with
the existing footings ($423,835); (5) building concrete foundation
beams ($510,044); and (6) building a new floor slab ($1,220,740).  
Herrera testified that these steps would cost $5,878,119, plus a
six percent consulting fee, for a total cost of improving the soil
of $6,230,806.  
        The second component of the cost of repair sought by
PRASA was the repair of the roof structure itself.  PRASA argues
that the evidence of the cost of reinstalling the collapsed roof
varied from $470,000 to $2,513,211.48.  PRASA first points to the
testimony of Lluch's expert, Engineer Rafael Jimnez.  Jimnez
testified that repairing the roof structure would require repairing
and installing the steel trusses ($420,000), repairing the concrete
columns ($21,000), and removing the twisted steel ($70,000), for a
total of $511,000.  Engineer Edison Lluch also testified for
defendants regarding the cost to repair the collapse.  Eng. Lluch
agreed with Jimnez that those three steps needed to be undertaken,
but disagreed with Jimnez's estimate of cost.  Eng. Lluch
estimated the steps to cost $421,000, $20,000, and $29,000,
respectively, for a total of $470,000.  
        For the highest estimated cost of repair, PRASA points to
the cross-examination of Eng. Lluch, during which PRASA claims that
Eng. Lluch acknowledged that he had written a letter to Seaboard
Surety Company claiming $2,513,211.48 for repair of the structure.  
In that letter, PRASA claims that Eng. Lluch included estimates on
how much it would cost: (1) to remove the collapsed structure; (2)
to replace the damaged steel structure; (3) to install the steel
structure; and (4) to repair the damage to the concrete columns.
However, Eng. Lluch also testified that much of the claimed amount
was not related to the collapse, but was related to the fact that
Richmond abandoned the project.  PRASA does not itemize the
$2,513,211.48 claim to explain how much was claimed by Lluch as
repair for the collapse and how much was claimed because Richmond
abandoned the project.  
        In total, PRASA claims that the jury was presented
evidence that the soil would cost $6,230,806 to improve and that
the steel roof structure would cost anywhere from $470,000 to
$2,513,211.48 to repair. PRASA argues that the jury verdict
awarding no damages was clearly contrary to the weight of this
evidence.
        In response, appellees offer two arguments.  First,
appellees raise the legal argument that PRASA was not legally
entitled to compensation for the collapse.   Appellees argue that
Clauses V and VIII of the construction contract provided PRASA with
a choice of remedies in the event of a breach by Lluch.  Clause V
provided that if Lluch failed in the performance of the contract,
PRASA could hire a substitute contractor to complete the work at
Lluch's expense.  Appellees describe this remedy as the "in natura"
remedy for breach of contract.  Clause VIII was a penalty clause
that obligated Lluch to pay PRASA $1,400 for each day that
completion of the project was delayed due to Lluch's failure to
fulfill its obligations.   
        Appellees argue that Clauses V and VIII, in conjunction,
provide the only remedies available to PRASA:  specific performance
or substitute performance, with Lluch paying the liquidated late
fees or cost overruns.  Appellees cite Article 1106 of the Puerto
Rico Civil Code for the proposition that, in obligations that
include a penalty clause, the penalty shall substitute indemnity
for damages.  See P.R. Laws Ann. tit. 31,  3131.  Appellees also
cite Rodrguez Cancel v. A.E.E., 16 P.R. Offic. Trans. 542 (1995),
in support of their argument that, by contracting for the "in
natura" remedy, the parties precluded the recovery of monetary
damages.  Appellees argue that, instead of choosing one of those
remedies, PRASA unjustifiably demolished the entire structure,
making it impossible for either Lluch or a substitute contractor to
finish the project.  From this, appellees claim that PRASA opted
out of both remedies available to it, and therefore is not entitled
to recover monetary damages now.
        We reject appellees' first argument because it ignores
the fact that PRASA did not bring its claim solely under a breach
of contract theory.  Appellees may well be correct that PRASA's
remedies for a pure breach of contract action are limited to the
remedies provided in the contract.  However, while the exact nature
of PRASA's claims is not at all clear from the record, this was not
a pure breach of contract action.  The district court treated the
action as a breach of contract action in which the claimed breach
of contract was Lluch's negligent construction.  The district court
asked the first jury: "Do you find that Constructora Lluch
improperly removed the surcharge from the construction site or in
any other way breached its contract with PRASA by negligent
construction work?"   Similarly, the district court instructed the
second jury to accept as an established fact that Lluch "breached
its contract with PRASA by negligent construction work."  In
numerous instances, the court used hybrid language that makes it
clear that it entertained both contract and tort theories and
remedies in this case, and properly so.  At oral argument,
appellees agreed with PRASA that, under Ramos v. Orientalist Rattan
Furniture, Inc., 1992 WL 755597 (Puerto Rico 1992), if a party is
damaged by acts or omissions that constitute both a breach of
contract and a breach of duty, the damaged party may make a tort
claim based on the breach of contract.  Appellees argue that this
was not the case here, but we disagree.  Lluch's negligence
breached both the construction contract and its duty not to cause
damage to others, so PRASA may seek to recover under either a tort
or contract theory.
        PRASA attempted to recover damages under a negligence
tort theory.  Article 1054 of the Puerto Rico Civil Code states:
        Those who in fulfilling their obligations are
        guilty of fraud, negligence, or delay and
        those who in any manner whatsoever act in
        contravention of the stipulations of the same
        shall be subject to indemnity for the losses
        and damages caused thereby.

P.R. Laws Ann. tit. 31,  3018.
        Nowhere in the construction contract do the parties agree
to limit Lluch's liability for any damages suffered by PRASA due to
Lluch's negligence.  Consequently, appellees may not assert the
contractual limits on breach of contract damages as a bar to
PRASA's recovery in this case.  In short, the collapse of the roof
structure was found to be caused by Lluch's negligent construction
and was clearly a reasonably foreseeable consequence of such
negligence.  Therefore, the cost of repairing the structure
following the collapse was properly recoverable by PRASA under a
tort theory.  See id. (providing for recovery of "losses and
damages" against those who are negligent in fulfilling their
obligations); P.R. Laws Ann. tit. 33,  3024 (defining "losses and
damages" as those foreseen or which may have been foreseen at the
time of entering into the obligation).   
        Appellees' second argument is that PRASA could prove no
damages in the amount of the cost to repair the structure because
PRASA would never have incurred any such damages; Lluch would have.  
The district court instructed the jury that PRASA was entitled to
recover any amount which will reasonably compensate it for any
damages it suffered as a result of Lluch's breach of contract or
negligence as of the date of the collapse on October 22, 1989;
specifically, the cost to repair the collapse.  Appellees argue
that PRASA would never have actually incurred the cost of repairing
the collapse, because that amount would have been absorbed by
Lluch.  Appellees argue that because Lluch had contracted to
deliver the completed structure, Article 1481 of the Civil Code
allocated to Lluch any loss caused by destruction of the project
before delivery.  See P.R. Laws Ann. tit. 33,  4122 ("If the
person who contracted for the work bound himself to furnish the
materials, he shall suffer the loss in case of the destruction of
the work before it is delivered, unless there has been a delay in
receiving it.").  From this, appellees argue that, up until PRASA's
unjustified demolition of the entire structure, Lluch was
responsible for absorbing the cost of repairing the collapsed
structure, not PRASA.  Appellees argue that this responsibility
disappeared when PRASA demolished the entire structure because
Lluch could no longer deliver the completed structure.
        We cannot accept this argument as an explanation for how
the jury could reasonably have determined, consistently with its
duty to follow the court's instructions, that PRASA was entitled to
no damages.  Appellees' argument regarding the allocation of the
burden of the collapse is a strictly legal theory that was never
presented to the jury.  At oral argument, counsel for appellees was
asked whether this theory was ever presented to the jury.  Counsel
stated that the theory had been explained in the form of Eng.
Lluch's and Jimnez's testimony that the cost of repair was to be
absorbed by Lluch and was never to have been invoiced to PRASA.  
However, the fact that the jury heard testimony regarding Lluch's
alleged intent that would give life to appellees' legal theory does
not mean that the jury was instructed on the legal theory itself.  
The jury was specifically instructed that PRASA was entitled to
recover the cost of repairing the collapse.  The jury was not asked
to first determine whether PRASA would have actually suffered the
cost of repair if it had not demolished the structure.  Appellees
do not argue that they objected to this instruction and do not
cross-appeal on this issue.  In fact, Appellees do not even appear
to argue that this portion of the instruction was incorrect.  
Rather, what appellees seem to argue is that the jury properly
awarded no damages despite the existence of this instruction.  At
oral argument, appellees' counsel was asked whether it was
erroneous to instruct the jury that PRASA was entitled to recover
the cost of repairing the collapse.  Counsel responded that it was
not erroneous to do so, but that PRASA failed to prove the amount.  
As a result of appellees' failure to object, we accept this
instruction as correct and as the law of the case.   
        We are left with a situation in which the court
instructed the jury that PRASA could recover the cost of repairing
the collapse, and PRASA showed that the cost of repairing the
collapse was significant.  We do not rule on whether the soil
needed to be improved before the structure could be repaired or
whether the cost of repairing the roof structure itself was closer
to $470,000 or to $2,513,211.48.  We find only that, under any of
those theories, the evidence before the jury was that the cost of
repair was at least $470,000.  Consequently, a verdict of no
damages is not consonant with both the instructions given and the
evidence presented.  We find that the jury abdicated its duty to
follow the instructions given by the district court, which resulted
in a verdict that is against the clear weight of the evidence.  
Additionally, we find that it was an abuse of the district court's
discretion to deny PRASA's motion for a second partial new trial on
the issue of damages.  The judgment awarding PRASA no damages is
vacated, and we remand for a new trial on the issue of damages.
        B.  Redetermination of Settled Issues By the Second Jury  
        in Violation of the Seventh Amendment

    PRASA also argues that the district court abused its
discretion in allowing the second jury, due to misleading jury
instructions and verdict forms, to redetermine the issues of
Lluch's liability and the existence of PRASA's damages.  PRASA
claims that these two issues were revisited by the second jury in
violation of the Seventh Amendment, which states that "no fact
tried by jury, shall be otherwise reexamined in any Court of the
United States, than according to the rules of the common law."  
U.S. Const. amend. VII.   
    We summarily dismiss PRASA's claim that the jury was
allowed to redetermine the issue of Lluch's liability.  PRASA
offers nothing more than the absence of a jury award in support of
its argument.  However, the jury was specifically instructed: (1)
that it had already been established that Lluch was negligent and
breached its contract with PRASA; (2) that Lluch's breach caused
the collapse of the structure; and (3) that PRASA was entitled to
recover any damages it suffered due to Lluch's negligence or
breach.  In light of these instructions, it simply cannot be said
that the 1997 jury was allowed to redetermine the question of
Lluch's liability.  In fact, the jury was specifically told that
this issue had been determined and that they should disregard any
testimony to the contrary.  Thus, we turn to PRASA's contention
that the jury was improperly allowed to redetermine the existence
of PRASA's damages.
    PRASA argues that the district court violated the Seventh
Amendment when it did not set aside the first jury's determination
that Lluch's negligence caused PRASA damages, but still allowed the
second jury to redetermine the existence of PRASA's damages.  PRASA
argues that the second jury should only have determined the extentof PRASA's damages, not whether PRASA suffered any damages at all.  
PRASA argues that the second jury was allowed to revisit this issue
because the district court: (1) failed to instruct the jury that it
was already established that PRASA suffered damages; and (2)
specifically instructed the jury that it had the option of finding
that PRASA had not suffered any damages.
    PRASA cites several cases for the proposition that the
Seventh Amendment requires district courts to conduct successive
trials in such a way that the same issue is not reexamined by
different juries.  Without addressing the questions of whether the
authority cited by PRASA adequately demonstrates such a Seventh
Amendment principle or whether that principle is applicable in the
context of a partial new trial on the issue of damages, we note
that no such principle was violated in this case.  The district
court did not allow the second jury to redetermine the issue of
whether PRASA suffered damages.  It is true that the second jury
was not instructed that it had already been established that PRASA
suffered damages.  And it is also true that the second jury was
instructed that it could fail to award PRASA any damages at all.  
However, this instruction was given in the context of explaining to
the jury that it was PRASA's duty to establish the amount of any
damages caused by Lluch's negligence or breach of contract.  Seeid.  It is neither inaccurate nor an infringement on PRASA's
Seventh Amendment rights to instruct the jury that PRASA could not
recover any damages if it failed to prove any damages at the
partial new trial, whether the previous jury found that PRASA
suffered any damages or not.  To hold otherwise would be to hold
that the jury was obligated to award PRASA damages even if PRASA
failed to put on any evidence at all at the partial new trial.  
This cannot be the case.  Thus, the district court did not err in
instructing the jury that it could fail to award PRASA any damages
at all, despite the first jury's determination that PRASA was
damaged by Lluch's negligence.  
    In short, the district court did not err in failing to
order a second partial new trial because of the alleged
reexamination of issues by the second jury.  No such reexamination
of issues actually occurred.
    C.  Unfair Influence on the Verdict Through Appellees'
    Counsel's Prejudicial Comments During Opening Statements
    and Closing Arguments

    PRASA's final contention as to why the district court
should have granted a second partial new trial on the issue of
damages is that appellees' counsel unfairly influenced the verdict
with two impermissible and prejudicial arguments to the jury.  
PRASA claims: (1) that CNA's counsel made improper reference to the
limits of Lluch's insurance policy with CNA during CNA's opening
statement; and (2) that Lluch's counsel made improper reference to
PRASA's demolition of the structure during Lluch's closing
argument.
    Absent an abuse of discretion, we will defer to the
district court's denial of a motion for a new trial on the basis of
improper argument or conduct of counsel.  See Meyers v. Moody, 693
F.2d 1196, 1220-21 (5th Cir. 1982), cert. denied, 464 U.S. 920
(1983); see also Johnson v. National Sea Prods., Ltd., 35 F.3d 626,
631 (1st Cir. 1994).  In assessing the effect of improper conduct
by counsel, the Court must examine the totality of the
circumstances, including the nature of the comments, their
frequency, their possible relevancy to the real issues before the
jury, the manner in which the parties and the court treated the
comments, the strength of the case, and the verdict itself.  SeeForrestal v. Magendantz, 848 F.2d 303, 309 (1st Cir. 1988)(quoting
City of Cleveland v. Peter Kiewit Sons' Co., 624 F.2d 749, 756 (6th
Cir. 1980)).  We reverse only upon a showing of prejudice.  SeeGonzlez-Marn v. Equitable Life Assurance Soc'y, 845 F.2d 1140,
1147 (1st Cir. 1988).
    PRASA first complains of CNA's counsel's reference to
Lluch's policy limits in CNA's opening statement.  PRASA claims
that this was done for the sole reason of appealing to jury
sympathy.  CNA pointed out that Lluch would have to pay most of the
millions sought by PRASA from its own funds, because the insurance
policy limit was $500,000.  However, the parties agree that the
insurance policy was admitted into evidence as Joint Exhibit VII.  
Because the jury could have easily discovered the policy limits for
itself, we cannot say that the district court abused its discretion
in refusing to grant a new trial on the basis of CNA's improper
argument.
    PRASA next complains that it was improper for Lluch's
counsel to make reference to PRASA's demolition of the structure in
his closing argument.  However, because PRASA did not make a timely
objection to this statement, we review only for plain error.  SeeFernndez v. Corporacin Insular de Seguros, 79 F.3d 207, 210 (1st
Cir. 1996);  Johnson, 35 F.3d at 631 (citations omitted).  
    We do not find it to be plain error: (1) to allow Lluch's
counsel to refer to the demolition of the structure; or (2) to fail
to grant a new trial on the basis of such a reference.  It was a
stipulated fact that the demolition of the structure occurred in
the weeks following January 25, 1993.  Also, the jury was
specifically instructed that it had already been established that
PRASA's demolition of the structure was unjustified.  In light of
the evidence and instructions with which the jury was provided, we
do not believe that Lluch's mention of the demolition during
closing argument resulted in any prejudice to PRASA.   
    In sum, the district court did not err in failing to
grant a second partial new trial due to the reference to Lluch's
policy limits during CNA's opening statement or the reference to
PRASA's demolition of the structure during Lluch's closing
argument.  
III.  Jury Verdict in Favor of Lluch's Counterclaims
    PRASA's final argument regards a portion of the 1993
verdict that was not remitted:  the award of $756,471.59 in favor
of Lluch on its counterclaims for breach of contract and amounts
owed on the contract.  PRASA complains that this award was also
against the weight of the evidence.

    A.  Preservation of This Issue On Appeal
    A motion for a new trial must be made in the first
instance before the trial court, particularly where the weight of
the evidence is at issue.  See Velzquez v. Figueroa-Gmez, 996
F.2d 425, 427 (1st Cir.), cert. denied, 510 U.S. 993 (1993); Wells
Real Estate v. Greater Lowell Bd. of Realtors, 850 F.2d 803, 811
(1st Cir.) (citing 6A Moore's Federal Practice  59.15[3], at 326-
27 (2d ed. 1987)), cert. denied, 488 U.S. 955 (1988).  The failure
to move for a new trial waives the issue on appeal.  See Velzquez,
996 F.2d at 427; Wells Real Estate, 850 F.2d at 811.
    PRASA did not move for a new trial on Lluch's
counterclaims.  However, following the judgment on Lluch's
counterclaims, PRASA filed a two-page motion for judgment as a
matter of law on those claims.  On October 27, 1995, the district
denied PRASA's motion.  The district court found that Lluch
presented evidence: (1) that PRASA breached the contract; (2) that
this breach caused damages to Lluch; and (3) that PRASA owed Lluch
monies on the contract.  The district court found that the evidence
presented was sufficient to allow a reasonable jury to reach a
verdict in favor of Lluch on its counterclaims.
    While PRASA's failure to file a motion for a new trial
would ordinarily require this Court to find that the issue has been
waived, the fact that PRASA filed a motion for judgment as a matter
of law helps PRASA to avoid that result.  In Velzquez, the
appellants sought to challenge the verdict as against the weight of
the evidence.  See Velzquez, 996 F.2d at 427.  We held that, even
though the appellants failed to make the appropriate motion for a
new trial before the district court, the issue was not waived
because the appellants made a motion to set aside or amend the
verdict.  See id.  We found that because the purpose of the
appellants' motion was to challenge the verdict as against the
weight of the evidence, the appellants should not have been deemed
to have waived the issue.  See id.  We noted that the district
court addressed the sufficiency argument and denied the motion
because the jury's verdict was supported by the evidence.  See id.  
Consequently, we treated the appellants' motion as a motion for a
new trial and treated the appeal as an appeal of the denial of that
motion for a new trial.  See id.   
    The same situation is presented in the present appeal:
(1) PRASA made a motion challenging the verdict as against the
weight of the evidence; (2) the district court addressed the
sufficiency argument; and (3) the district court denied the motion
because the jury's verdict was supported by the evidence.  
Therefore, we treat this appeal as an appeal from the denial of
PRASA's motion for a new trial on Lluch's counterclaims.
    B.  Denial of PRASA's Motion for a New Trial on Lluch's
    Counterclaims

    Again, the denial of a motion for a new trial is reviewed
for abuse of discretion.  See Bogosian, 104 F.3d at 482.  A verdict
may be set aside and a new trial ordered "when the verdict is
against the clear weight of the evidence, or is based upon evidence
which is false, or will result in a clear miscarriage of justice."  
Phav, 915 F.2d at 766.
    PRASA points to the testimony of Jos A. Toro-Mercado, a
certified public accountant who PRASA claims testified on behalf of
Lluch that PRASA owed Lluch $2,121,956.35 as a result of change
orders, additional work, materials, and extended office overhead.  
PRASA claims that Toro-Mercado's testimony was based on three main,
but faulty, premises: (1) that Lebrn, the designer of the project,
was at fault for the collapse of the steel roof structure; (2) that
all delays in the construction project were attributable to PRASA;
and (3) that Lluch had worked at the project between August 1, 1988
and October 20, 1990.
    PRASA argues that the first of these three premises was
contradicted by the 1993 jury verdict itself.  PRASA claims that
the 1993 jury specifically ruled that Lluch, not Lebrn, was solely
liable to PRASA for the negligent removal of the surcharge that
caused the collapse of the structure.  PRASA argues that the second
premise was also contradicted by the 1993 jury verdict and the
evidence adduced at trial.  PRASA notes that the 1993 jury omitted
any finding that PRASA had been solely responsible for the delays
in the project.  PRASA also claims that all of the evidence
regarding job certifications that was presented at trial showed
that Lluch or its subcontractors were as much responsible for the
delays as was PRASA.  PRASA also notes that "the certifications
were reconciled during trial by the parties, clearly showing that
PRASA was not remotely the sole responsible party for the delays in
the project."  Regarding the third premise, PRASA argues that there
was "better evidence" of the time period of Lluch's presence at the
project.  
    PRASA's argument fails in several respects.  First, while
the 1993 jury found Lluch to have been liable, it did not find that
Lebrn was faultless.  The liability of Lebrn was not before the
jury, and the jury made no determinations regarding this issue.
Second, the "omission" of a finding that PRASA was solely
responsible for project delays is hardly a finding that PRASA was
not responsible for any delays that may have caused Lluch damages.  
Third, PRASA does not direct the Court to any of the evidence it
claims demonstrated Lluch's responsibility for delay in
construction.  Fourth, even if the certifications were "reconciled"
during trial, PRASA does not explain to the Court how that "clearly
show[s] that PRASA was not remotely the sole responsible party for
the delays in the project."  Fifth, PRASA makes no attempt to
identify the "better evidence" of an allegedly more accurate time
period of Lluch's involvement in the project.
    Finally, and most importantly, the jury awarded Lluch
$756,471.59 on its counterclaims, even though PRASA admits that
Toro-Mercado testified that PRASA owed Lluch $2,121,956.35.  It is
quite possible that the jury questioned Toro-Mercado's three
premises and reduced the damages award accordingly.  For example,
the jury may have reduced the award by the amount it determined
that Lluch was at fault for the delays.  Or it may have reduced the
award because it did not agree that Lebrn was solely at fault for
the collapse.  Or it may have reduced the award because it believed
that the "better evidence" referred to by PRASA demonstrated that
Lluch was not on the job as long as it claimed.  This is, of
course, all speculation, but PRASA does not offer any argument as
to why the amount actually awarded was against the weight of the
evidence.  PRASA offers several arguments that demonstrate why
Lluch should not have been granted all it requested, but the fact
remains that Lluch was not granted all it requested.
    In the jury verdict form, the 1993 jury found: (1) that
PRASA breached its contract with Lluch; (2) that this breach caused
damages to Lluch in the amount of $138,758; and (3) that PRASA owed
Lluch $617,713.59 for work performed on the contract.  PRASA does
not offer any evidence or argument that Lluch did not in fact
suffer damages in the amount of $138,758 or that Lluch was not in
fact owed $617,713.59 for work performed on the contract.  
Consequently, we reject PRASA's claims that the verdict was against
the weight of the evidence and leave undisturbed the judgment in
favor of Lluch on its counterclaims.
                          CONCLUSION
    Based on the foregoing, the judgment awarding PRASA no
damages is VACATED, and this case is REMANDED for a new trial on
the issue of damages.  The judgment awarding Lluch $756,471.59 on
its counterclaims for breach of contract and amounts owed on the
contract is AFFIRMED.

</body>

</html>